# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
### EASTERN DIVISION

| | | |
|---|---|---|
| TYRONE WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 4:08CV1020 CAS/AGF |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This action is before this Court for judicial review of the final decision of the Commissioner of Social Security finding that Plaintiff Tyrone Williams was not entitled to disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434. The action was referred to the undersigned United States Magistrate Judge under 28 U.S.C. § 636(b) for recommended disposition. For the reasons set forth below, the Court recommends that the decision of the Commissioner be reversed and that the case be remanded for further consideration.

Plaintiff, who was born on December 7, 1955, applied for disability benefits on February 9, 2006, alleging a disability onset date of December 12, 2005, due to torn cartilage in both knees and bursitis in his left shoulder. A previous application for disability benefits filed by Plaintiff had been denied on November 8, 2005, by an Administrative Law Judge ("ALJ") who found, following a hearing, that although

Plaintiff could not perform his past work as an electrician, he had the residual functional capacity ("RFC") to perform the full range of sedentary work and, in light of his vocational factors (age, education, work experience), was not disabled. (Tr. 56-61.)

After Plaintiff's current application was denied at the initial administrative level, he requested a new hearing before an ALJ, and such a hearing was held on May 16, 2007, before a different ALJ than the one who denied his prior application. At the hearing, Plaintiff testified about his physical impairments, as well as psychological/mental impairments, including depression. A vocational expert ("VE") also testified at the hearing. On June 16, 2007, the ALJ held that although Plaintiff could not perform his past work as an electrician, there were other jobs that existed in significant numbers in the national economy that he could perform, and that he was therefore not disabled as defined by the Social Security Act. The Appeals Council of the Social Security Administration denied Plaintiff's request for review on June 5, 2008. Plaintiff has thus exhausted all administrative remedies and the ALJ's decision of June 16, 2007, stands as the final agency action now subject to judicial review.

Plaintiff argues that the ALJ's decision is not supported by substantial evidence in the record as a whole. Specifically, Plaintiff argues that the ALJ erred in discrediting the opinions of a consulting psychiatrist (Wayne Stillings, M.D.) and psychologist (Samuel Bernstein, Ph.D.) with regard to Plaintiff's mental/psychological limitations. Plaintiff also asserts that the ALJ's physical RFC assessment was improper because it was not based on any medical evidence.

## Work History and Application Forms

The record shows that Plaintiff worked as a union electrician from September 1980 until August 2004, with annual earnings fluctuating from as low as approximately $13,000 in 1980 to as high as approximately $81,000 in 2000. (Tr. 101, 108.)

On a Function Report completed on March 3, 2006, Plaintiff described his daily activities as getting up, helping dress his grandchildren for daycare and driving them there; taking care of "different business," such as going to a doctor's office, the union hall, a lawyer's office, the store; going home and resting because his knees would hurt; picking up his grandchildren from daycare; and, with his wife's help, taking care of his grandchildren in the evening. He wrote that due to knee pain, he could no longer climb, bend his knees, or stand or sit for "too long." Although he checked a line on the form indicating that he had no problem with personal care, he added that his knees hurt when he engaged in personal-care activities such as dressing and bathing that required bending or standing for "too long." He also wrote that he had short-term memory loss due to "experiment shots" he took in 1991 during the Gulf War. Id. at 123-25.

Plaintiff indicated that he sometimes prepared simple meals, but that his wife did most of the cooking. He sometimes helped with cleaning, but not for "too long" because his knees would hurt, and for the same reason, he no longer mowed the yard. Plaintiff reported that he went outside every day, drove a car, and shopped for food and clothes, but not that often and for only about 30 minutes each time. He could pay bills and handle a checking account. His impairments affected activities such as lifting, bending, and

walking, and also completing tasks and concentrating.  Plaintiff wrote that he could handle stress "pretty good."   He stated that whenever he walked, he used a cane and a knee brace on each knee, as prescribed by his doctor.  He also wrote that his knees did not get better after corrective surgery, but rather got worse.  Id. at 125-30.

In an undated Social Security Disability Report, it was noted that Plaintiff claimed that in addition to knee, shoulder, and general physical pain, he had chronic fatigue and short-term memory loss.  He was currently taking Glucousamin as a joint lubricator; Mobic, a non-steroidal anti-inflammatory drug ("NSAID"); and Naproxen for pain. Plaintiff reported that caring for his personal needs caused "a great deal of pain" in his knees.  Id. at 134-40.  In a later, also undated report, Plaintiff represented that he was taken off Naproxen because it caused internal bleeding, and that he was currently taking Tylenol arthritis pain medication instead three times a day, as prescribed by his doctor. Id. at 145.

**Medical Record**

The record shows that Plaintiff sustained an injury to his right knee in 2000 when stepping off a ladder at work, and an injury to his left knee when stepping off a ladder at work in July 2003.  In April 2005, Plaintiff underwent left knee surgery.  The next month, Plaintiff's orthopaedic surgeon released Plaintiff "for full duty" as far as his left knee was concerned.  Id. at 167.  In October 2005, Plaintiff and his employer settled a workers' compensation claim based on 25% loss of use of the left knee and 15% loss of use of the right knee.  Id. at 162-63.

In November 2005, Plaintiff presented to Dennis A. Dusek, M.D., with complaints of right knee pain. Plaintiff stated that he believed he was disabled from working as an electrician because he had to climb ladders for this work. Dr. Dusek advised Plaintiff that that may not necessarily be so and that the postoperative condition of his left knee would be monitored while proceeding with treatment for the right knee. Id. at 242.

On December 13, 2005, Dr. Dusek performed right knee arthroscopic surgery to repair a chronic tear of the medial meniscus "involving nearly the entire posterior horn," and also repairing crondal damage to the medial femoral condyle that occurred during the procedure. Id. at 235. Ten days later, Plaintiff returned to Dr. Dusek for follow-up, and also for left shoulder pain of 20 to 25 years' duration, originating from a motor scooter mishap when Plaintiff was on active military duty and for which Plaintiff was reportedly receiving disability benefits (presumably from the Veteran's Administration).

On examination, Plaintiff's shoulder showed full flexion in external rotation, with internal rotation to the small of the back. He had full range of motion of the cervical spine without aggravation of the shoulders. Impingement signs were "mildly" positive, but Plaintiff had full rotator cuff strength on the left. Dr. Dusek found no evidence of neurovascular compromise, and noted that x-rays of Plaintiff's left shoulder taken the same day revealed a Type II to III acromion,[1] but were otherwise "essentially" normal. Dr. Dusek concluded that Plaintiff's shoulder pain was likely due to bursitis and he was

---

[1] Studies have shown an increased incidence of rotator cuff tears in persons with Type II and Type III acromions. http://www.aafp.org.

given a two-week supply of Mobic to "calm" the shoulder. Dr. Dusek noted that the Mobic would also help Plaintiff's right knee as it recovered from surgery. In addition, Plaintiff was advised to take Glucosamine and Chondroitin (both used to relieve joint pain and restore cartilage) for his right knee. He was told to return in six weeks for follow-up, and that if the Mobic was not sufficient for the shoulder, a cortisone shot would be tried. Id. at 191-92.

When Plaintiff saw Dr. Dusek on February 26, 2006 for follow-up, he told Dr. Dusek that when he took the Mobic, both his shoulder and knee felt better, but that he had "not been taking it daily." On physical examination, Plaintiff had full active range of motion of the right knee. A "mild effusion" and "mild medial joint line tenderness" were noted. Dr. Dusek noted that Plaintiff had pain in his left shoulder when he flexed past 130E, but could "actively flex the arm full," had no problem with internal rotation, and had full range of motion "with this." Plaintiff was given a 30-day prescription for Mobic, with two refills, and was reminded to take the Glucosamine and Chondroitin, which he had not yet taken. Id. at 248.

On April 18, 2006, Plaintiff was examined by psychiatrist Wayne Stillings, M.D., upon referral by Plaintiff's counsel, for an independent medical evaluation. Dr. Stillings reviewed Plaintiff's medical records back to 1991. Plaintiff complained of sleeping problems, depression due to his work injuries and Gulf War Syndrome, short-term memory loss, and pain and weakness in both knees. Plaintiff recounted that he was in Iran for three months during the Gulf War, assembling electrical equipment near the front

line, and that his unit was showered with radioactive material.  In addition, he reported

that he  received a vaccine against various biological agents, and that from the time he

returned from the war, or shortly thereafter, he was continually depressed, with his

depression later aggravated by his work-related injuries.  Plaintiff reported that he sought

psychiatric treatment through the VA which refused his request.  In the spring of 2000, he

saw a nurse practitioner, but not a psychiatrist.  Plaintiff told Dr. Stillings that he could

not afford private psychiatric care, but wanted psychiatric treatment for his depression.

Id. 269-272.

On mental status examination, Dr. Stillings observed that Plaintiff was obese,

walked with a slight limp on the right side, manifested psychomotor retardation and slow

and deliberate speech, often off the point.  Dr. Stillings found that Plaintiff had a mild

formal thought disorder, with his thoughts only loosely connected with the subject of the

conversation.  Concentration was impaired and Plaintiff displayed psychological distress

in the form of tearfulness and gaze avoidance regarding the Gulf War.  According to Dr.

Stillings, Plaintiff had "a paranoid flair" to his personality.  His mood was depressed, his

memory was poor and inaccurate, he was impaired cognitively by psychiatric problems,

and intellectually, he functioned in the lower aspects of the normal range with poor self

insight and questionable judgment.  Id. 274-75.

The Minnesota Multiphasic Personality Inventory ("MMPI") II, which Dr.

Stillings believed produced a valid profile, showed that Plaintiff was experiencing

significant psychological problems -- he had an inappropriate or blunted affect and was

depressed, ineffective in life, confused, disoriented, tense, anxious, and agitated with possible hostility. Dr. Stillings observed that this profile was indicative of chronic pain. Plaintiff had difficulty managing routine affairs and was withdrawn with no energy for life. Dr. Stillings diagnosed chronic major depressive disorder; pain disorder associated with psychological factors and his general medical condition; paranoid personality traits; and a GAF of 52.[2] Dr. Stillings opined that Plaintiff's psychiatric conditions created "an obstacle or barrier to employment or reemployment"; and that Plaintiff's depression and paranoia predated his work-related injuries which then caused additional psychiatric problems, such that "the total disability is greater than the sum, and [Plaintiff] is totally and permanently disabled from gainful employment." Id. at 275-76.

Plaintiff was seen by VA psychologist Elizabeth Beck on May 15, 2006. He asserted that he believed his physicians did not fully address his medical needs. He focused a great deal of attention and energy on events that occurred during the Gulf War, including radiation exposure. Dr. Beck encouraged Plaintiff to attend depression group therapy sessions in order to learn effective coping skills for depression and stress. Id. at 351-53, 359.

On June 6, 2006, x-rays of Plaintiff's shoulders revealed no fracture, dislocation,

---

[2] A GAF score represents a clinician's judgment of an individual's overall ability to function in social, school, or occupational settings, not including impairments due to physical or environmental limitations. Diagnostic & Statistical Manual of Mental Disorders (4th ed.) (DSM-IV) at 32. GAF scores of 31-40 indicate "major" impairment in social, occupational, or school functioning; scores of 41-50 reflect "serious" impairment in these functional areas; scores of 51-60 indicate "moderate" impairment; scores of 61-70 indicate "mild" impairment.

abnormal soft tissue calcification, or other osseous abnormality.  Id. at 290-91.  One month later, Plaintiff complained of bilateral knee pain.  He stated that he did not want an injection recommended by the orthopaedics department, and reported that he used an NSAID only when his pain was severe.  The healthcare provider noted that an NSAID and heat pack effectively treated Plaintiff's knee pain.  Plaintiff also reported no energy and difficulty sleeping, but he denied depression.  Plaintiff had a low but steady gait; a physical examination was normal.  He was told to continue taking an NSAID regularly rather than waiting until his pain was severe.  Id. at 347-50.

Plaintiff was seen on July 7, 2006, with continuing complaints of hypertension, bilateral knee pain, obesity, and sleep apnea.  He complained of having no energy and difficulty with sleep.  Id. at 348.  In October 2006, the VA medical center noted that Plaintiff had a 20% service-connected disability due to clavicle or scapula impairment. Id. at 314.

On October 3, 2006, upon referral by his attorney, Plaintiff underwent a psychological consultative examination by Samuel Bernstein, Ph.D, a licensed psychologist and vocational expert.  Dr. Bernstein noted that Plaintiff used a cane when he entered the office and walked with a limp favoring the right side.  Plaintiff reported a long history of psychological problems dating to his exposure to depleted uranium radiation during the Gulf War.  Plaintiff related that after the Gulf War, he became withdrawn and experienced problems with concentration and short-term memory.  He described his mood as "sad" and indicated that he felt "a lot" of stress and anxiety.

Plaintiff also stated that he could only sit for 15 to 20 minutes, stand for 10 to 15 minutes, and walk one-half block.  Dr. Bernstein noted that Plaintiff scored in the "severe" range on the Beck Anxiety Inventory[3] and the Hamilton Depression Inventory.[4]  Plaintiff  was noted to have problems sleeping, but no hallucinations or delusions.  He did not want to go out of the house, described himself as a loaner, and felt that his condition was getting worse.  Dr. Bernstein concurred in Dr. Stillings's opinion that Plaintiff had major depression, and that Plaintiff  was unable to work after 2003 because of a combination of psychological and physical problems.  Dr. Bernstein concluded that Plaintiff's psychological factors impacted him in terms of concentration, memory and fatigue, that he had some paranoid tendencies, and that he was "unemployable in the open competitive labor market" and "would not be hired nor could he carry out work on a sustained and regular basis."  Dr. Bernstein advised Plaintiff to apply for Social Security disability benefits.  Id. at 278-83.

On October 11, 2006, Plaintiff sought treatment for knee pain which had worsened due to a car accident in July 2006 in which his right knee jammed into the dashboard.  Plaintiff wanted to know if he had bone cancer or brain cancer due to radiation exposure

---

[3]     The Beck Anxiety Inventory consists of 21 items, each describing a common symptom of anxiety, and asks the respondent to rate how much he or she has been bothered by each symptom over the past week on a 4-point scale ranging from 0 to 3.  The items are summed to obtain a total score that can range from 0 to 63.  http://www.cps.nova.edu/~cpphelp/BAI.html.

[4]     The Hamilton Depression Inventory, a screen for symptoms of depression, consists of a 23-item self-report for adults.  http://www.tjta.com/products/TST_020.htm.

in the Gulf War.  The caregiver noted that a psychological evaluation should be ordered.  It was noted that Plaintiff had a "slow but steady" gait and walked with a cane, and that he was alert, fully oriented, and in no acute distress.  Plaintiff was instructed to continue the NSAID and to schedule an injection for his knee.  A treatment note addendum indicated that Plaintiff refused a knee injection and wanted an evaluation for bone cancer.  Id. at 339-40.

On January 1, 2007, Plaintiff was diagnosed with mild degenerative joint disease of knees bilaterally, obstructive sleep apnea, and morbid obesity.  Id. at 323-26.

**Evidentiary Hearing of May 16, 2007 (Tr. 37-44)**

Plaintiff, who was represented by counsel, testified that he was 51 years old and a high school graduate, and that his only work in the past 15 years was as an electrician.  Plaintiff testified that after his knees were injured at work, he had surgery on his left knee in April 2005, and on his right knee in December 2005.  Currently, his right knee was "bone to bone and it's popping," and his left knee was starting to give him problems, aches, and pains, as he had favored his right knee for so long.  The ALJ observed that Plaintiff had a cane with him and Plaintiff testified that he used it for stability when walking and that it was given to him by a VAMC doctor upon Plaintiff's request.  Plaintiff testified that he had bursitis in his left shoulder due to a motorcycle accident and that he could not "raise it to full extension."  Plaintiff stated that he was 5' 11" tall and weighed about 295 pounds, which was about 30 pounds heavier than when he was working every day.

Plaintiff testified that he had been treated for sleep apnea for many years and still had sleep disorder problems. He had a pending application for benefits through the VA due to Gulf War Syndrome, which Plaintiff testified had caused short-term memory loss and "some stages of depression." He acknowledged that he had never had a psychiatric consultation through the VA and had never requested one. He also believed that his knee problems were affected by Gulf War Syndrome because he was exposed to radiation and experienced deterioration of his bones and a low white blood cell count.

Plaintiff testified that due to pain in his joints and knees he could sit for only 15 minutes at a time, stand for 15 minutes, and walk one-half block using his cane, and less without his cane. He would elevate his legs when sitting to relieve the pain in his joints and knees and to prevent swelling in his knees.

The ALJ asked the VE to consider a person with Plaintiff's vocational factors (age, education, work experience), who could lift 20 pounds occasionally and 10 pounds frequently; could do no repetitive pushing or pulling of those weights with his legs; required a sit/stand option; could occasionally balance, stoop, kneel, crouch, crawl, and climb stairs and ramps, but could never climb ropes, ladders, or scaffolds; could do no repetitive overhead reaching on the left; and had to avoid concentrated exposure to unprotected heights and vibration. The VE responded that such a person would not be able to perform Plaintiff's past work, but would have the skills and physical ability to perform the jobs of electrical parts assembly work or inspection, both of which were at the light exertional level and were available in significant numbers in the national

economy, even with a sit/stand option.

Upon further questioning by the ALJ, the VE testified that if the individual needed a hand-held device to ambulate, this would interfere with the dexterity required for the jobs the VE had identified. The ALJ asked, "Well, what effect would that have on the jobs? Would he have to do something else or would it go to sedentary?" The VE responded, "Well, yes, I would probably go to more of a sedentary situation."

Plaintiff's counsel then asked the VE to consider an individual with Plaintiff's vocational factors who needed a cane for stability, could sit and stand for only 15 to 20 minutes before having to change positions, and could walk for only one half block at a time. In addition, this hypothetical individual experienced depression, which was contributed to by his inability to function and pain, and which affected his concentration, memory, fatigue, and paranoid tendencies. This individual also had persistent pain in both knees and limited mobility of his left shoulder. The VE testified that he would agree with Dr. Bernstein that such an individual would not be able to sustain any work activity. The VE noted that Dr. Bernstein's professional reputation was excellent.

**ALJ's Decision of June 16, 2007 (Tr. at 16-23)**

The ALJ summarized the medical evidence with regard to Plaintiff's knee and shoulder problems. He then noted that although Plaintiff did not claim disability due to hypertension or obesity, the record showed some treatment for these conditions. The ALJ found, however, that Plaintiff's hypertension and obesity were non-severe. The ALJ then summarized Dr. Stillings' and Dr. Bernstein's reports. The ALJ stated that Dr.

Bernstein's report was "notable for its failure to contain reference to clinical findings," and also contained no reference to diagnostic findings, other than mentioning that Plaintiff scored in the severe range on the Beck Depression Inventory and Hamilton Anxiety Inventory, scores which were based on Plaintiff's own reports.

The ALJ found that Plaintiff's emotional/mental impairments "imposed no more than minimal effect on Plaintiff's ability to do basic work activity" and were thus non-severe. In making this finding, the ALJ found it significant that these impairments did not necessitate frequent inpatient or emergency care, and that there was no evidence of ongoing pursuit of care. The ALJ pointed to the fact that the examinations of Drs. Stillings and Bernstein were conducted not for the purpose of obtaining treatment, but rather in preparation for the hearing in this case. This led the ALJ to find "suspect any clinical findings of a severe nature." The ALJ added that Dr. Stillings only opined that Plaintiff was "moderately limited" from an emotional/mental standpoint. In sum, the ALJ found that Plaintiff was only mildly limited with respect to his ability to perform activities of daily living, to socially function, and to sustain concentration, persistence, or pace; and that Plaintiff had had no episodes of decompensation.

The ALJ found that Plaintiff had the severe impairments of chronic knee pain status post-surgery, and left shoulder bursitis, and that Plaintiff's impairments, considered singly or in combination, did not meet or equal the criteria for any deemed-disabling impairment listed in the Commissioner's regulations. The ALJ proceeded to determine whether Plaintiff had the RFC to perform his past work, noting the relevant factors set

forth in <u>Polaski v. Heckler</u>, 739 F.2d 1320 (8th Cir. 1984), in evaluating the credibility of a claimant's subjective allegations.

The ALJ stated that he found significant "the relatively unremarkable findings on muskuloskeletal examinations" conducted by Dr. Dusek, the fact that Plaintiff reported taking only Tylenol for his pain, and Plaintiff's "acknowledgment of continued ability to engage in a variety of daily activities -- attending to his personal care, caring for his two grandchildren, preparing meals, occasionally helping clean the house, driving, shopping, and managing money. The ALJ found Plaintiff's subjective complaints to "not be fully credible." The ALJ concluded that Plaintiff had the RFC to lift and/or carry 20 pounds occasionally and ten pounds frequently; sit, stand, and/or walk (with usual breaks) for about six hours in an eight-hour workday; and occasionally climb stairs, balance, stoop, kneel, crouch, and crawl; but he could not climb ropes, ladders, and scaffolding, could not reach overhead repetitively on the left side, and had to avoid concentrated exposure to extreme cold, vibration, and hazards of unprotected heights.

The ALJ stated that in reaching this RFC, he placed "nominal weight" on the statements of Drs. Stillings and Bernstein that Plaintiff was unable to work, as that was a matter for the ALJ to determine. The ALJ stated further that the opinion of a consultant who examined a claimant only once did not constitute "substantial evidence upon the record as a whole." The ALJ stated that in arriving at his RFC assessment, he considered "the administrative findings of fact made by the State agency medical physicians and other consultants."

The ALJ determined that Plaintiff's RFC rendered him unable to perform his past work as an electrician.  The ALJ recognized that the burden therefore shifted to the Commissioner to show that there were other jobs existing in significant numbers in the national economy that Plaintiff could perform.  The ALJ found that this burden was met by the VE's credible testimony that a person with Plaintiff's RFC and vocational factors "could perform a variety of jobs including the job of parts inspector . . . and light assembler," jobs which existed in significant numbers in the state and national economies.   Accordingly, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision so long as it "'complies with the relevant legal requirements and is supported by substantial evidence in the record as a whole.'"  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009) (quoting Ford v. Astrue, 518 F.3d 979, 981 (8th Cir. 2008)).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id. (citation omitted).  In reviewing the record, the court "must consider both evidence that supports and evidence that detracts from the Commissioner's decision."  Id.  Reversal is not warranted, however, "so long as the ALJ's decision falls within the 'available zone of choice.'"  Bradley v. Astrue, 528 F.3d 1113, 1115 (2008) (citation omitted).  The

16

decision of the ALJ is not outside the 'zone of choice' simply because a reviewing court might have reached a different conclusion had it been the initial trier of fact. Id. Rather, "if after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Owen v. Astrue, 551 F.3d 792, 798 (8th Cir. 2008) (citation omitted).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable physical or mental impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment -- any impairment or combination of impairments which significantly limits the claimant's physical or mental ability to do basic work activities. 28 C.F.R. 404.1520(c). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would

17

have no more than a minimal impact on [his or] her ability to work." Page v. Astrue, 484

F.3d 1040, 1043 (8th Cir. 2007).

If the claimant does not have a severe impairment that meets the duration

requirement, the claim is denied.  If the impairment, or combination of impairments, is

severe and meets the duration requirement, the Commissioner determines at step three

whether the claimant's impairment meets or is equal to any of the presumed-disabling

impairments listed in the Commissioner's regulations.  If not, the Commissioner asks at

step four whether the claimant has the RFC to perform his past relevant work.  If the

claimant is able to perform his past relevant work, he is not disabled.  If he cannot

perform his past relevant work, the burden of proof shifts at step five to the

Commissioner to demonstrate that the claimant retains the RFC to perform other jobs that

exist in significant numbers in the national economy, consistent with the claimant's

vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular exertional category

of work (heavy, medium, light, and sedentary) listed in the Commissioner's regulations,

the Commissioner may carry this burden by referring to the Guidelines, which are fact-

based generalizations about the availability of jobs for people of varying ages,

educational backgrounds, and previous work experience, with differing degrees of

exertional abilities.  Where a nonexertional impairment such as a mental disorder

significantly limits the claimant's ability to perform the full range of work in a particular

category, the Commissioner cannot carry this burden by relying exclusively on the

Guidelines, but must consider testimony of a VE on the availability of jobs that a person with the claimant's RFC and vocational factors could perform.  Baker v. Barnhart, 457 F.3d 882, 894-95 (8th Cir. 2006).

**Severity of Plaintiff's Mental Impairments - Weight Accorded the Opinions of Drs. Stillings and Bernstein**

Plaintiff argues that the ALJ erred in finding at step two of the evaluation process that Plaintiff's depression and anxiety were not "severe" impairments.   Plaintiff contends that in making this determination, the ALJ erred in discounting the evaluations and opinions of Drs. Stillings and Bernstein.

"An impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities."  Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (citing Page v. Astrue, 484 F.3d 1040, 1043 (8th Cir. 2007)).  It is the claimant's burden to establish that an impairment is severe.  Id.  "Severity is not an onerous requirement for the claimant to meet, but it is also not a toothless standard . . . ."  Id. at 708 (citation omitted).

A special technique is used to determine the severity of mental disorders.  This technique calls for rating the claimant's degree of limitations in four areas of functioning: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  The limitation in the first three functional areas is assigned a designation of either "none, mild, moderate, marked, [or] extreme." Id. § 404.1520a(c)(4).  The degree of limitation in regard to episodes of

decompensation is determined by application of a four-point scale: "[n]one, one or two, three, four or more." Id. When the degree of limitation in the first three functional areas is rated either "none" or "mild" and the limitation in the fourth area (decompensation) is rated "none," impairments are not severe, "unless the evidence otherwise indicates that there is more than a minimal limitation in [a claimant's] ability to do basic work activities." Id. § 404.1520a(d)(1). The ability to do basic work activities includes the abilities for understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting. Id. § 404.1521(b).

As noted above, here Drs. Stillings and Bernstein, each a one-time examining consultant, reported that Plaintiff had serious depression and was unable to work. The two reports were approximately eight months apart, one in February 2006 and the other in October 2006. The weight to be given a medical opinion is governed by a number of factors, including the examining and/or treatment relationship, the length of the treatment relationship and frequency of examination, the consistency of the source's opinion, and whether the source is a specialist in the area. 20 C.F.R. § 404.1527(d).

Here, the Court believes that the ALJ committed reversible error in discounting the medical opinions of Drs. Stillings and Bernstein. The ALJ's statement that Dr. Bernstein's report contained no clinical findings is problematic. This report was not based merely on a review of the record, but on Dr. Bernstein's own examination of Plaintiff. And the report noted the results of the Beck Depression Inventory and

Hamilton Anxiety Inventory, which Dr. Bernstein administered and interpreted.  For the

ALJ to say that these clinical findings were not valid because they were based on

Plaintiff's self-reports amounts to the ALJ improperly substituting his own lay opinion

for the opinions of the examining mental health professionals.  See Pratt v. Sullivan, 956

F.2d 830, 834 (8th Cir. 1992) ("Instead of crediting the opinions of the mental health

professionals, the ALJ substituted his own unsubstantiated conclusion concerning a

mental impairment for the express diagnoses of [Plaintiff's] examining psychiatrists and

psychologists.  Such disregard of the record constitutes reversible error."); cf. Osborne v.

Barnhart, 316 F.3d 809, 812 (8th Cir. 2003) (holding that substantial evidence supported

the ALJ's decision that the claimant was not depressed, where although Beck Depression

Inventory score indicated severe depression, the examiner administering the test felt that

the claimant's condition was milder and a consulting psychiatrist labeled the claimant a

malinger).

It is true that statements by a medical source that a claimant could not be gainfully

employed "are not medical opinions but opinions on the application of the statute, a task

assigned solely to the discretion of the Secretary," Nelson v. Sullivan, 946 F.2d 1314,

1316 (8th Cir. 1991), and that such statements are "not conclusive as to the ultimate

question" of disability.  Id. at 1316-17; Cruze v. Chater, 85 F.3d 1320, 1325 (8th Cir.

1996).  But while such statements are not conclusive, the ALJ did not provide a sound

basis for disregarding these opinions altogether.  Significantly, there are no opinions in

the record by any mental health professionals that call into question the opinions of Dr.

Stillings and Dr. Bernstein.

The ALJ also erred in rejecting the evaluations of Drs. Stillings and Bernstein on the basis that the opinion of a one-time examining consultant does not constitute substantial evidence. This principle is applicable when an ALJ denies benefits by relying on the opinion of a one-time examining consultant that contradicts the opinion of a treating professional and the record as a whole. See, e.g., Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000). But this reasoning does stand for the proposition that the opinion of an examining consultant that supports the claimant's allegation of disability can simply be disregarded. The Commissioner's regulations provide that generally more weight is to be given to an examining source than a non-examining source. 20 C.F.R. § 404.1527(d)(1).

One reason given by the ALJ for not according Plaintiff's allegations of mental/psychological impairment "more than minimal weight" seems valid -- Plaintiff's failure to seek treatment for this problem. See, e.g., Banks v. Massanari, 258 F.3d 820, 825-26 (8th Cir. 2001) (holding that the ALJ properly discounted the claimant's complaints of disabling depression because, among other reasons, she did not seek continuing psychiatric treatment). But here, the record strongly suggests that Plaintiff suffered from mental problems that would have more than a minimal impact on his ability to work.

In sum, the Court believes that the ALJ did not provide sufficient reasons for giving the opinions of Drs. Stillings and Bernstein minimal weight. See Pruitt v. Astrue,

No. 1:08CV20 LMB, 2009 WL 877695, at *16 (E.D. Mo. March 30, 2009) (reversing

and remanding case where ALJ did not consider the opinions of examining consultants

with regard to the plaintiff's mental impairments).

**ALJ's RFC Determination**

Plaintiff argues that the ALJ's RFC assessment is not supported by any medical

evidence. As noted above, the Eighth Circuit has defined RFC as the ability to do the

requisite work-related acts "day in and day out, in the sometimes competitive and

stressful conditions in which real people work in the real world." Forehand v. Barnhart,

364 F.3d 984, 988 (8th Cir. 2004) (citation omitted). The ALJ's determination of an

individual's RFC should be "based on all the evidence in the record, including 'the

medical records, observations of treating physicians and others, and an individual's own

description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir.

2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

The ALJ bears the primary responsibility for determining a claimant's RFC. Id. at

1023. Although an RFC is based on all relevant evidence, it "remains a medical

question" and "'some medical evidence must support the determination of the claimant's

[RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001)).

The ALJ is therefore required to consider at least some supporting medical evidence that

addresses the claimant's "'ability to function in the workplace.'" Cox v. Astrue, 495 F.3d

614, 619 (8th Cir. 2007) (quoting Lauer, 245 F.3d at 704). The absence, however, of an

explicit reference to "work" in close proximity to the description of the claimant's

medically evaluated limitations does not make it impossible for the ALJ to ascertain the claimant's work-related limitations from that evaluation; such explicit language is unnecessary where the medical evaluation describes the claimant's functional limitations "with sufficient generalized clarity to allow for an understanding of how those limitations function in a work environment." Id. 620 n.6.

Here, upon review of the record, the Court finds that there was insufficient medical evidence to support the ALJ's assessment of Plaintiff's physical RFC. While the ALJ stated that he based his RFC assessment on the findings of state physicians and other consultants, no such findings appear in the record. Remand is accordingly warranted. See Pruitt, 2009 WL 877695, at *15 (reversing and remanding where no doctors opined as to the plaintiff's physical functional limitations).

In addition, the Commissioner's regulations provide that when assessing an individual's RFC, the ALJ must consider "an individual's impairments, even those that are not 'severe'"; when considered in combination, "the limitations due to such a 'not severe' impairment may prevent an individual from performing past relevant work or may narrow the range of other work that the individual may still be able to do." 20 C.F.R. § 404.1523; Social Security Ruling 96-8p, 1996 WL 374184, at *5. Here, there is little if any indication that the ALJ considered whether there were any mental limitations, even if they were not "severe," that would impact Plaintiff's RFC, and this constitutes reversable error. See White v. Comm'r of Soc. Sec., 312 F. App'x, 779, 787-88 (6th Cir. 2009) (holding that although ALJ did not err in finding that social security disability claimant's

mental impairment was not severe, ALJ was required to explain totally discounting the objective evidence of claimant's mental impairment in determining his RFC).

## CONCLUSION

The Court does not believe that the ALJ's opinion can be affirmed. On remand, upon further development of the record, the ALJ must consider, in assessing Plaintiff's RFC, the combined effect of all mental and physical impairments.

Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be **REVERSED** and that the case be **REMANDED** to the Commissioner for further consideration.

The parties are advised that they have ten days to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.

_Audrey G. Fleissig_
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 24th day of July, 2009.